IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEREMY WAYNE SNELSON,

                      Plaintiff,

  v.                                                   OPINION and ORDER

DEREK S. WILSON and KATHIE E. KLINGER-BERG,      23-cv-336-jdp

                      Defendants.

---

Plaintiff Jeremy Wayne Snelson, proceeding without counsel, alleges that defendant prison nurses provided inadequate medical care for a serious eye injury caused by metal shrapnel. I allowed Snelson to proceed on Eighth Amendment medical care and Wisconsin-law medical negligence claims against Wilson and Klinger-Berg.

Snelson faults defendant Derek S. Wilson for not contacting an on-call provider when Wilson first examined him, which caused a delay in the removal of the object from his eye. Snelson faults defendant Kathie E. Klinger-Berg for delaying his receipt of medicated eye drops when he returned from the emergency room after receiving treatment for his eye injury.

Defendants move for summary judgment. Dkt. 42. The evidence shows that Wilson considered Snelson's complaints and treated him for them at the initial visit. Even if Wilson's care wasn't the best possible, he used his medical judgment, which is all the Eighth Amendment requires. As for Klinger-Berg, even if she knowingly delayed Snelson's receipt of the medicated eye drops, there's no evidence that the delay harmed him. I will grant summary judgment to defendants on Snelson's medical care claims, and I will relinquish jurisdiction over his medical negligence claims.

UNDISPUTED FACTS

The following facts are undisputed except where noted. Snelson is incarcerated at Stanley Correctional Institution (SCI) and was incarcerated there when the events at issue occurred. Wilson and Klinger-Berg worked at SCI as nurses.

On February 23 or 24, 2023, metal shrapnel entered Snelson's left eye while he was working in the weld shop. On February 24, 2023, Snelson left work around 2:30 p.m., and his eye was slightly irritated. At 6:00 p.m., Snelson asked to be seen by health services unit (HSU) staff for a complaint that a foreign object was in his eye.

Wilson saw Snelson for his complaint at 7:02 p.m. that evening. Wilson documented that Snelson's left eye was red, irritated, itchy, teary, and sensitive to light. Dkt. 39-1 at 6. Snelson reported a pain level of seven out of ten.

The parties dispute some details of this visit. Wilson says that Snelson told him that Snelson believed that whatever had been in his eye had come out because he had decreased pain at that time. Dkt. 45 ¶ 33. Wilson also says that Snelson's only visual disturbance was some light sensitivity in his left eye. *Id.* ¶ 37. Snelson disputes that he told Wilson that he thought that an object had fallen out, and he contends that Wilson could not have known whether he had light sensitivity because he didn't perform a visual acuity test. Dkt. 53 ¶ 27.

Wilson examined Snelson's eye with an otoscope and didn't detect an object. For Wilson's plan of care, he gave Snelson Visine eye drops with instructions on how to use them, and he told him to contact HSU if the problem didn't improve.

Wilson saw Snelson for a nursing sick call on February 26, 2023, at 10:48 a.m. Snelson was seen urgently because his left eye problems were worsening. Wilson again examined Snelson's eye with an otoscope and didn't detect an object. But because Snelson's condition

2

had worsened, Wilson contacted the on-call doctor, Dr. McLean. Dr. McLean ordered Snelson to be sent to the hospital for evaluation and treatment.

Snelson was immediately transported to the emergency room at Stanley Aspirus Hospital. Snelson was seen by Dr. Randal Wojciehoski, who found a foreign object in his cornea. Dr. Wojciehoski documented that he couldn't remove the object because he didn't have a slit lamp. Dkt. 39-1 at 28. Dr. Wojciehoski noted that Snelson needed to go to ophthalmology the next morning. Dr. Wojciehoski also noted that Snelson had no vision loss. *Id.* At 11:21 a.m., Dr. Wojciehoski discharged Snelson with instructions to use gentamicin ophthalmic ointment four times a day. *Id.* at 28–29.

Snelson was returned to SCI around 11:30 a.m. that day, where defendant Klinger-Berg saw him. Klinger-Berg noted that Snelson had received gentamicin ophthalmic solution from the hospital, not the gentamicin ophthalmic ointment that Dr. Wojciehoski ordered. Gentamicin ophthalmic solution and gentamicin ophthalmic ointment are different versions of the same medication, but each requires a separate prescription. Klinger-Berg lacked the authority to allow Snelson to keep the gentamicin ophthalmic solution because a provider hadn't actually prescribed it. Klinger-Berg contacted Dr. McLean, who updated Snelson's prescription to gentamicin ophthalmic solution. An order was entered for the gentamicin ophthalmic solution on 12:51 p.m. that day. Dkt. 39-1 at 9.

Gentamicin ophthalmic solution works by killing bacteria that can cause an infection and by preventing bacterial infections from developing. Defendants' expert, Dr. Laura Sukowaty, says that gentamicin drops don't alleviate pain. Dkt. 39 ¶ 40. Snelson says that Dr. Wojciehoski told him that gentamicin would help with his eye pain and promote healing because it's an antibiotic. Dkt. 53 ¶ 7.

Klinger-Berg's standard practice is to call the patient's housing unit and have the patient report to HSU to pick up medication once an order has been updated. Dkt. 47 ¶ 25. Klinger-Berg concedes that, due to the passage of time and high volume of patients that she has seen in the interim, she doesn't remember if she followed this practice that day. *Id.* Snelson says that Klinger-Berg deviated from her standard practice because he didn't receive the gentamicin ophthalmic solution until February 27, 2023, at 7:57 a.m. Dkt. 53 ¶ 53; Dkt. 51-20.

Meanwhile, on February 26, 2023, Snelson was seen at an eye clinic, where an ophthalmologist removed an object from his eye using a slit lamp. About one week later, the ophthalmologist ground out residual rust from Snelson's cornea. In early April 2023, the ophthalmologist removed two additional small foreign objects and diagnosed Snelson with a corneal scar. Snelson continues to receive treatment for problems with his left eye, which he says is permanently injured.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

**A. Federal medical care claims**

The Eighth Amendment prohibits prison officials from consciously disregarding the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a medical care claim, Snelson must show that he had an objectively serious medical condition that defendants consciously disregarded. *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017).

The court concludes, for purposes of summary judgment, that Snelson had a serious medical need after he injured his left eye and a serious medical need for the gentamicin

4

ophthalmic solution that he didn't immediately receive. *Cf. Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (stating that an injury that a reasonable doctor would find important and worthy of treatment can be a serious medical need). Thus, the dispositive issues are whether: (1) Wilson consciously disregarded Snelson's serious medical need for immediate eye care from a provider; and (2) Klinger-Berg consciously disregarded Snelson's serious medical need for the gentamicin ophthalmic solution.

Conscious disregard requires that defendants are subjectively aware of that need. *See Cesal*, 851 F.3d at 721. That means that defendants know of facts from which the inference could be drawn that a substantial risk of serious harm exists, and they actually draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Conscious disregard involves intentional or reckless conduct, not mere negligence. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

The Eighth Amendment entitles prisoners to "adequate medical care," that is, "reasonable measures to meet a substantial risk of serious harm." *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). The Eighth Amendment doesn't require "specific care" or "the best care possible." *See id.*; *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Disagreement between defendants and Snelson, or between two medical professionals, about the proper course of treatment isn't enough to show conscious disregard. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). If a medical professional has provided some care for a prisoner's condition, he consciously disregards the prisoner's serious medical need only if his care is so inadequate that it demonstrates an absence of medical judgment, that is, that no minimally competent professional would have responded in that way in the circumstances. *See Stewart v. Wexford*

*Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998). Snelson must also show that the deprivation of medical care injured him. *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019).

### 1. Wilson

Snelson proceeds against Wilson based on the allegation that he didn't contact an on-call doctor at the February 24, 2023, visit. Dkt. 16 at 5.

Wilson treated Snelson's eye problem at this visit. Wilson didn't contact an on-call doctor, but the Eighth Amendment doesn't entitle Snelson to specific care or the best care possible. Wilson saw Snelson an hour after he asked to be seen by HSU staff. Wilson documented Snelson's symptoms and examined his eye with an otoscope but didn't find anything. Wilson also gave Snelson Visine and told him to contact HSU if his condition didn't improve. And Wilson's care didn't end there. Wilson examined Snelson two days later and, even though he didn't find an object, he contacted Dr. McLean because Snelson complained of worsening eye symptoms. Wilson did not consciously disregard Snelson's need for immediate eye treatment from a provider. *Cf. Walker v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (courts must consider the "totality" of a prisoner's care when deciding whether a medical professional has consciously disregarded his serious medical need).

Snelson contends that Wilson's examination was "cursory." Dkt. 49 at 13. But the evidence doesn't support that view. Wilson documented that Snelson reported a pain level of seven out of ten, and that his eye was red, irritated, itchy, teary, and sensitive to light. Snelson's own description of his symptoms is not meaningfully different. *See* Dkt. 53 ¶ 22. Even if Wilson's notes don't fully agree with Snelson's description of the visit, the evidence shows that Wilson evaluated his complaints. Wilson also examined Snelson's eye and, even though he

didn't find an object, he prescribed Visine and told him to contact HSU if he didn't get better. Wilson assessed Snelson and made an effort to help him; his examination wasn't cursory.

Similarly, Snelson contends that Wilson chose "easier and less efficacious treatment" without exercising medical judgment. Dkt. 49 at 13. In particular, Snelson faults Wilson for not conducting his examination in accordance with the eye, ear, nose, and throat (EENT) nursing protocols. Dkt. 53 ¶ 15, 27, 29; *see also* Dkt. 39-2 at 1. Dr. Sukowaty says that Wilson's care followed those protocols. Dkt. 39 ¶¶ 27, 42, 45. This dispute is immaterial. The issue under the Eighth Amendment is whether Wilson based his treatment on medical judgment and, as I've explained, the evidence shows that to be the case. Even if Wilson's care didn't fully comport with the EENT nursing protocols, a "violation of a prison policy alone does not . . . suggest [conscious disregard]." *See Schroeder v. Sawall*, 747 F. App'x 429, 431 (7th Cir. 2019).

Snelson contends that Wilson's treatment notes contain "fabricated" information. Dkt. 53 ¶ 6. Snelson explains that: (1) he told Wilson that his eye injury happened on February 24, 2023, not the day before; (2) he never told Wilson that he thought an object had fallen out of his eye because it didn't hurt as badly as it did the day before; and (3) Wilson couldn't have known that he had light sensitivity because he didn't perform a visual acuity test. *Id.* ¶¶ 27, 42. Even if Snelson's medical record contains some inaccuracies, "an inaccurate medical record alone doesn't prove negligence, much less conscious disregard that would violate the Eighth Amendment." *Seymour v. Kostohryz*, No. 22-cv-170-jdp, 2024 WL 2846868, at *4 (W.D. Wis. June 5, 2024). Snelson further contends that Wilson's use of inaccurate information "showed that he knew what he was doing was wrong" and that he was trying to "cover-up the mistake." Dkt. 49 at 12–13. This contention is factually unsupported. The record of the appointment is time-stamped, which indicates that Wilson created it when he saw

7

Snelson. *See* Dkt. 39-1 at 5–6. And there's no evidence that, at that time, Wilson thought that Snelson had an object in his eye. There's no basis to infer that Wilson thought that he had made a mistake, let alone that he sought to cover up a mistake by fabricating treatment notes.

Snelson points out that his prison grievance was affirmed, and that the reviewing authority (a nurse) found that Wilson: (1) couldn't have ruled out a foreign object simply by looking at Snelson's eye and that the mechanism of injury indicated that something else might have been wrong; and (2) should have called the on-call doctor based on his assessment. Dkt. 51-6; Dkt. 51-13. But, again, a violation of a jail policy is not enough to show conscious disregard. *See Schroeder*, 747 F. App'x at 431. Also, Dr. Sukowaty opines that Wilson was justified in not sending Snelson immediately to the emergency room when he first saw him. Dkt. 39 ¶ 79. At most, Snelson has shown a disagreement among medical professionals, which does not show conscious disregard.

In sum, Snelson has not adduced evidence from which a reasonable jury could find that Wilson consciously disregarded Snelson's need for immediate treatment from a provider. I will grant summary judgment to Wilson on this claim.

**2. Klinger-Berg**

Snelson proceeds against Klinger-Berg based on the allegation that, when he returned from the emergency room, she denied him the eye drops that Dr. Wojciehoski prescribed. *See* Dkt. 16 at 6; Dkt. 29; Dkt. 33. I will grant summary judgment to Klinger-Berg on this claim.

I begin by clarifying this claim. Even though Dr. Wojciehoski prescribed gentamicin ophthalmic ointment, Snelson returned from the emergency room with gentamicin ophthalmic solution. Klinger-Berg lacked the authority to allow Snelson to keep the gentamicin ophthalmic

solution because a provider hadn't prescribed it. Snelson hasn't shown that Klinger-Berg denied him gentamicin ophthalmic ointment because she didn't have it to give him. Snelson's argument is that Klinger-Berg delayed his receipt of the gentamicin ophthalmic solution by 16 hours after Dr. McLean ordered it. Dkt. 53 ¶¶ 52–53. The real issue, then, is whether Klinger-Berg consciously disregarded Snelson's need for the gentamicin ophthalmic solution that Dr. McLean ordered after he returned from the emergency room. This isn't the exact issue on which I allowed Snelson to proceed against Klinger-Berg, but defendants haven't objected to Snelson's recharacterization of the issue.

Snelson contends that Klinger-Berg knew that Dr. McLean approved the gentamicin ophthalmic solution at 12:51 p.m. on February 26, 2024, but made no effort to ensure that he received it in the nearly four-hour period before she left work for the day. *See* Dkt. 49 at 16. Snelson also contends that the gentamicin ophthalmic solution that he received the next day at 7:57 a.m. was the same supply that that Dr. Wojciehoski had given him. *Id.*; Dkt. 53 ¶ 52. Therefore, Snelson's argument goes, Klinger-Berg failed to give him the medication that Dr. McLean ordered and provided. Klinger-Berg doesn't remember if she called Snelson's housing unit to have him pick up the medication once Dr. McLean updated the order. I will assume for purposes of summary judgment that she did not. So whether Klinger-Berg consciously disregarded Snelson's need for that medication depends on disputed facts.

But no reasonable juror could conclude that Klinger-Berg's delay harmed Snelson. There's no admissible evidence that Snelson's eye was infected or that using medicated eye drops lessened Snelson's eye pain. There's no evidence that Dr. McLean ordered the medicated eye drops for eye pain. Dr. Sukowaty says that gentamicin medicated eye drops don't alleviate eye pain. Snelson counters that Dr. Wojciehoski told him that gentamicin would help his eye

9

pain, but that is inadmissible hearsay. *See Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009) (courts may not rely on inadmissible hearsay on summary judgment).

Snelson contends that Dr. Sukowaty's expert report shows that medicated eye drops promote healing because they're an antibiotic. Dr. Sukowaty expressly says that any delay in receiving the medicated eye drops didn't harm Snelson. Dkt. 39 ¶ 81. Dr. Sukowaty does say that medicated eye drops may aid the healing of a corneal abrasion because they can prevent bacterial infections. *See id.* ¶ 32. Without any evidence that Snelson's eye was infected, the delay posed a risk of harm, but that's not enough to support an Eighth Amendment claim under § 1983. *See Lord v. Beahm*, 952 F.3d 902, 905 (7th Cir. 2020). I will grant summary judgment to Klinger-Berg on this claim.

**B. State-law medical negligence claims**

Snelson fails to establish that this court could exercise federal diversity jurisdiction these claims because he's a Wisconsin citizen and nothing in the record suggests that Wilson and Klinger-Berg are citizens of another state. When all federal claims have been dismissed, the general practice in federal court is to decline to exercise supplemental jurisdiction over the related state-law claims. *See Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). I'll follow that practice here and relinquish jurisdiction over Snelson's medical negligence claims without evaluating their merits.

Snelson may pursue his medical negligence claims in state court, subject to Wisconsin statutes of limitations (and other potentially applicable procedural bars). Those limitations periods have been tolled while this case has been pending, but they will begin again 30 days from now. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim asserted under

[the court's supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 42, is GRANTED. Plaintiff's Eighth Amendment medical care claims against defendants are DISMISSED with prejudice.

2. Jurisdiction is relinquished over plaintiff's state-law medical negligence claims.

3. The clerk of court is directed to enter judgment and close the case.

Entered November 7, 2024.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge